COMMONWEALTH OF PENNSYLVANIA and Raymond Williams et al.

v.

LOCAL UNION 542, INTERNATIONAL UNION OF OPERATING ENGINEERS, et al.

Civ. A. No. 71–2698.

United States District Court.
E. D. Pennsylvania.

Nov. 7, 1979.

As Amended April 25, 1980.

Harold I. Goodman, Germaine Ingram, Community Legal Services, Inc., Philadelphia, Pa., for class plaintiffs.

Herbert B. Newberg, Philadelphia, Pa., for plaintiffs.

Margaret Hunting, Dept. of Justice, Harrisburg, Pa., Jerry Drew, Dept. of Justice, Philadelphia, Pa., for Com. of Pa.

Marvin I. Barish, Gordon Gelfond, Jack J. Bernstein, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., and Thompson Powers, Kenneth I. Jonson, Douglas Herbert, Steptoe & Johnson, Washington, D.C., for Local 542, Intern. Union of Operating Engineers and Union Trustees of the Operating Engineers Joint Apprenticeship Training Committee of Phila., Eastern Penna. and Delaware.

John J. McAleese, Jr., Thomas J. McGoldrick, Cunniff, Bray & McAleese, Bala Cynwyd, Pa., for defendant Contractor Assn. and Contractor (Glasgow, Inc., Contractors Assn. of Eastern Pa., Gen. Building Contractors Assn.; United Contractors Assn.; Employer Trustees of the Operating Engineers Joint Apprenticeship and Training Committee of Phila. E. Penna. and Delaware (JATC)).

Robert W. Kopp, David M. Pellow, Bond, Schoeneck & King, Syracuse, N.Y., for Bechtel Power Corp.

Martin Wald, Nicholas N. Price, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for United Engineers & Constructors, Inc.

Arthur R. Littleton, Dennis J. Morikawa, Philadelphia, Pa., for Catalytic Corp. and Fluor Corp.

Francis A. Mastro, Apruzzese & McDermott, Springfield, N.J., for Delaware Contractors Assn.

## OPINION

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.[*]

I.

*The Impoundment and Settlement Process*

Today I file an opinion which supplements and explains a decree filed on August 8, 1979. By agreement of all parties, the August decree was impounded when filed; no one other than my staff and I saw it or was aware of its contents. The decree will be released from impoundment upon the filing of this opinion. Since the impoundment process, which I also invoked for the November 30, 1978 liability opinion, is somewhat unique, a description of the events and an explanation is appropriate.

The impoundment was in the best interests of the parties and the public as it maximized the chances for settlement. All parties desired to have the court move forward with the resolution of pending legal issues, while they simultaneously explored settlement options on their own. Litigants settle cases because neither party knows for sure what the ultimate outcome of the litigation will be. In a sense, it is almost like a shell and pea game; when your shell is picked up, will you be a big winner or a disappointed loser, and what will the ultimate amount of damages be, if any?

The litigants were sensitive to the realities of the settlement process; they recognized that a premature revelation of the trial judge's ultimate views could cause the "winning" party to harden his position and thereafter be less receptive to a compromise. Such inflexibility at the bargaining table would decrease the probability of any settlement and add years to a case which has been litigated for several years already. The parties at one point asked me to assist them in the settlement process. While I was supportive of any bona fide settlement efforts of the parties, I did not want to be privy to any confidential settlement discussions while I was adjudicating issues of liability or formulating the contents of the formal decree; hence, the necessity for the impoundment process.

There were at least two substantial efforts to settle the case. The first major attempt occurred during the summer of 1978 after there had been an election of different officers for the union and a change of counsel for the union. At that time the record had already been closed;

[*] United States Circuit Judge sitting by designation.

proposed findings of fact and briefs had been filed; and the matter had been argued. The case had been bifurcated earlier and had been tried on the liability issues only. At some point in 1978, though from my view far too belatedly, the parties seemed to acknowledge that even if the plaintiffs received a favorable liability decree, the battle would be far from won because the scope of the decree and the amount of damages could be subjects of further litigation which could protract this matter for additional years. If the issue of liability was resolved against all the defendants or any single defendant, further extensive litigation would follow on what injunctive relief would be appropriate, how jobs would be allocated, and how damages would be calculated on an individual basis. The decision on whether any specific person is entitled to monetary damages cannot be resolved at the liability stage. We were and still are dealing with a complicated matrix which involves thousands of union members and hundreds of thousands of man hours extending over more than a decade of work experience. The fact finder must ultimately review the work pattern and hours of each specific plaintiff (a named plaintiff or a member of the class) and compare his past record with what he would have gotten absent discrimination.

While I was anxious to have the case settled if the parties could agree, I did not want the settlement process to impinge on the judicial fact-finding aspects or to deter unduly my ultimate decision on the liability phase. Thus, it was agreed that I would finish my opinion as planned, and I would file and impound it; if the parties did not agree on a settlement, it would then be released from impoundment. The liability opinion was filed on November 30, 1978. In late December, 1978, I was advised that the parties could not settle the case, and accordingly my liability opinion was released from impoundment on January 2, 1979. *Commonwealth of Pennsylvania v. Local Union 542*, 469 F.Supp. 329 (E.D.Pa.1978). That opinion dealt with the factual and procedural background of this litigation's liability phase. The parties were obligated to file

proposed forms of decree consistent with the opinion.

In 1979 after the oral argument on the form and substance of the decree, another substantial effort was again made by the parties to settle the case. This time the parties asked me to participate in the settlement process in the hope that, with my knowledge of the record, I could make a recommendation that would be acceptable to all parties. So that my participation in settlement discussions would not infringe on the adjudicatory aspects of the case, I filed the decree on August 8, 1979 and only thereafter participated in several settlement conferences with the parties. Thus, the parties could discuss candidly their settlement views without fear of affecting my ultimate decision on the legal issues or on the form of the decree.

Tragically, the parties were once again unable to settle the case even though I made specific recommendations on dollar amounts and injunctive relief. One side was willing to accept my recommendation but the other side made, in my view, such an unrealistic demand that the class plaintiffs' cupboard will again be barren—except for the gratification that their counsel will be arguing refined, sophisticated legal doctrines about damages which they hope to collect years from now.

Some comment is also required on the influence of class certification on the settlement process. When this suit was filed, all twelve of the named plaintiffs were graduates of the Benjamin Franklin I or II program. At that time none, or at most one, of the named plaintiffs was a member of the union. In my opinion of November 30, 1978, when dealing with the issue of class certification, I noted:

I find that there is no conflict between such plaintiffs for purposes of trying the *legal* issues of this suit. Plaintiffs are not attacking the hiring hall system as constituted but rather are attacking practices which, while forming no part of the hiring hall's stated foundation neverthe-

less have a profound impact on its operation.

469 F.Supp. at 350 (emphasis supplied).

This previous certification of the class pursuant to Federal Rule of Civil Procedure 23 was for the liability phase of the case only. Since this case has not been settled, and it will proceed to the damage phase, I leave it for the judge who will try this case on the damage phase to ascertain whether the named plaintiffs—or the advisory committee of 15 to the plaintiffs' counsel—now satisfy the standards for class representation pursuant to Rule 23. For the purposes of settling or trying the damage issues of this suit, I would today reconsider the issue of whether the named plaintiffs are "representative parties [who] fairly and adequately protect the interest of the class" as required by Federal Rule of Civil Procedure 23(a)(4). In fact, it is difficult for me to ascertain what role the named plaintiffs are now exerting in this case. Apparently, instead of the named plaintiffs being the decisive ones making the decisions for settlement, that responsibility has been allocated to an advisory committee of fifteen, appointed by plaintiffs' counsel, to consult with plaintiffs' counsel and make decisions on settlement and damages for the entire class. On that committee, nine of the fifteen are parent body journeymen members of the union and thus are skilled operating engineers. Only two of the named plaintiffs are members of the advisory committee. Thus, for settlement purposes we had the anomaly that 87 percent of the advisory committee consisted of persons who did not file the suit. I am not certain that as a group the advisory committee's interests will be precisely the same, when it comes to settlement or damages, as those individuals who still seek for the first time entry into an apprenticeship program or membership in the union. I am not certain whether the parent body journeymen's desires to be compensated for financial damages purportedly suffered in the past will get higher priority in the settlement process than the opening of new jobs to people who have yet to get a union card. By these comments I am not impugning the members of the advisory committee. Many have testified before me and, with compassion, have revealed dreadful stories of years of humiliation, scorn and disparate treatment. But the settlement process requires a balancing of the interest of all members of the class and a settlement necessarily means that no one gets in full today what he hopes he might get by verdict a decade from now.

Similarly, these comments are not intended to impugn in any way plaintiffs' counsel, for I note on the record the court's high respect for the perceptiveness, dedication, and unlimited tenacity of plaintiffs' counsel. However, at the damage phase, all counsel must come to grips with the reality that it is often easier to litigate acrimoniously and protractedly than it is to use creative efforts in attempts to constructively terminate litigation. In the final analysis, the brilliant briefs of counsel, the flash of eloquent arguments, the citations in the future to their case as significant precedent, and even the drama of a packed courtroom will never be adequate mementos for the victims of discrimination who desire money and jobs *now*. Similarly, protracted litigation does not aid the defendants who at this stage must recognize that it is far better to conclude litigation with liability and responsibilities being defined now, than to wallow endlessly in a quagmire of unresolved disputes—as lawyers are kept busy litigating, and operating engineers and their employers are kept confused by the unending process.

## II. *The Scope of the Decree*

This section is intended to elucidate the purpose and bases of the August 8, 1979 decree in order to clarify these points for the parties and to facilitate meaningful appellate review. The factual and procedural background of this litigation is set forth in detail in my opinion on liability filed and impounded on November 30, 1978 and released from impoundment on January 2, 1979. In that opinion, I found that plaintiffs had proven that Local Union 542 had engaged in intentional discrimination in violation of Title VII and 42 U.S.C. Section

1981.[1] I also found that the named defendants and the defendant class were liable at least injunctively for such discrimination. No award of injunctive relief was made at the time that opinion was filed.

Since that time, the parties have submitted proposed forms of injunctive decrees, with supporting memoranda, and replies to the decrees proposed by the other parties. Extensive oral argument on those decrees was heard. The injunctive decree entered August 8, 1979, although borrowing in part from the proposed decrees, does not adopt any of those decrees in full.

Although it would not be practical or profitable to summarize all the provisions of the decree, the basic operative mechanisms can be briefly described. The major objectives of the decree are that the percentage of minorities in Local 542, the percentage of referrals they receive, and the percentage of hours they work all equal the percentage of minorities in the relevant communities. In other words, my primary concern is to remedy discrimination in entry, referral and hours.

With respect to entry, the main feature of the decree is the requirement that, for the first two years, one minority be admitted for each non-minority that is admitted until the percentage of minority members in a given district equals the percentage of minorities in the community in that district. For the third through fifth year, one minority must be admitted for each two non-minorities admitted. Other provisions of the decree designed to remedy entry discrimination require the validation of entry criteria and a one for one minority to non-minority ratio of admission into the Joint Apprenticeship Training Program.

The referral and hours problems are closely inter-connected. The decree sets goals for the percentage of hours worked by minorities for each year in each district. These goals increase until, by the fourth year of the decree, they equal the percentage of minorities in the relevant district's population. Referrals must also be made in accordance with these percentages. Employers whose minority hours do not meet these goals must request additional minority referrals and, if a sufficient number are not available from the hiring hall, employers must directly hire qualified minority operating engineers. Should the number of qualified minorities available through referral and direct hire be insufficient, the employers are under an obligation to train unskilled minorities. Also, since in many cases the amount of hours an operating engineer can work is dependent on the level of his skills, the decree requires that the defendants provide a retraining and upgrading program to improve the skills of minority operating engineers.

The direct oversight of the decree will be entrusted to a United States Magistrate who will be assisted by an Advisory Committee selected primarily by the parties. The parties will make quarterly statistical reports to the Magistrate. The requirements for entry, referral and hours are all subject to adjustment on the basis of these reports. I have deemed it essential that flexibility be maintained so that seemingly reasonable requirements that subsequently turn out to be too lenient or too onerous may be modified in the light of experience.

My starting point in formulating the decree was the following statement of the purpose and proper scope of a remedy for unlawful discrimination:

> The relief is intended to restore those wronged to their rightful economic status absent the effects of the unlawful discrimination. *Robinson v. Lorillard Corp.*, 444 F.2d 791 (C.A. 4), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). We are under a duty to render relief which will eliminate the "discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154,

---

1. Violations of Title VI, of 42 U.S.C. § 1985(3) and of 29 U.S.C. § 158 were also alleged. I found that plaintiffs had proven both discriminatory impact and discriminatory purpose.

The former finding alone is an independent basis both for the finding of the violations and the imposition of this decree.

85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965); see *Smith v. Young Men's Christian Association*, 462 F.2d 634 (C.A. 5, 1972). *Rosen v. Public Service Electric and Gas Co.*, 477 F.2d 90, 96 (3d Cir. 1973).[2]

■ In order to accomplish this end, I have found it unquestionably necessary to require the imposition of certain quotas to govern entry into the union, referrals to actual jobs, and hours worked. There is simply no other way, given the circumstances of this case, to effectively remedy the discrimination found here. All of the parties, in their proposed injunctive decrees and responses to the proposals of other parties, have acknowledged as much since all have included some type of quota remedy. It is well established that quotas are a permissible part of a remedial decree. *See E. E. O. C. v. American Telephone & Telegraph Co.*, 556 F.2d 167 (3d Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); *United States v. International Union of Elevator Constructors*, 538 F.2d 1012 (3d Cir. 1976); *Erie Human Relations Commission v. Tullio*, 493 F.2d 371 (3d Cir. 1974). *See also United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (voluntary affirmative action remedies are permissible even without a finding of actual illegal discrimination by the particular employer.) The proper imposition of quotas as a remedy for past discrimination violates neither statute. *E. E. O. C. v. A. T. & T.* (quota remedies do not violate Title VII remedial provision, 42 U.S.C. § 2000e–5(g)), nor the Constitution, *United States v. International Union of Elevator Constructors*, 538 F.2d at 1018; *Erie Human Relations Commission v. Tullio*, 493 F.2d at 375, n. 7. Nor is such a remedy improper because it provides relief to members of a class who have not been individually shown to be the victims of past discrimination. *E. E. O. C. v. A. T. & T.*, 556 F.2d at 174–75.

■ The case law does reveal certain pitfalls that must be avoided by courts ordering this type of relief. To the extent that such relief is predicated on statistical disparities, it must be found, on the basis of proper statistical analysis, that the disparities are the result of discrimination. *See Commonwealth of Pennsylvania v. O'Neill*, 473 F.2d 1029 (3d Cir. 1973) (in banc) (per curiam). As stated in my opinion on liability, I relied on both statistical and non-statistical evidence in concluding that unlawful discrimination had occurred. I examined in detail the statistical evidence revealing gross disparities between the percentage of minorities in the community and in the labor pool and the percentage of minorities in the union and the percentage of hours worked by minority operating engineers. I analyzed the testimony of defendants' experts who attempted to show that the statistics were not significant and that the disparities were caused by something other than racial discrimination. I ultimately credited the testimony of plaintiffs' expert and found that the statistical disparities were significant, and in conjunction with the other evidence, proved overwhelmingly that unlawful discrimination had occurred. In other words, were it not for the unlawful discrimination, no such disparities would exist.

In formulating the goals for minority membership in the union and for the hours worked by minority operating engineers, I have used the percentage of minority males between the ages of 18 and 65 in each district. I note that this is a conservative estimate. The actual percentage of minorities in the labor pool is probably higher. *See* 469 F.Supp. at 351. Thus, I have made here the type of factual findings with respect to the available work force that the court in *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 402 (3d Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977), considered "vital" and lacking in that case. Moreover, this decree requires no "across-the-board" quotas. *Id.* For example, I have refused to adopt plaintiffs' proposal that quotas be set for the hiring of shop stewards and business agents. Also,

---

**2.** Although specifically written with respect to remedies under Title VII, this statement is also applicable to remedies for discrimination in violation of sections 1981 and 1985(3).

the percentage requirements for hiring master mechanics and assistant master mechanics are lower in District I, where the concentration of minorities is highest than those required for general entry or referral purposes.[3] Finally, the decree is not open-ended with respect to duration. *Id.* The decree will expire in five years unless good cause is shown either for its extension or earlier termination.

Although providing a remedy for the victims of discrimination is, of course, the purpose of the decree, I recognize also that, in formulating each specific provision of that decree, I must consider the legitimate interests of the non-minority workers who may be affected by the decree, as well as the interests of their employers. *See, e. g., Carter v. Gallagher,* 452 F.2d 315, 330–31 (8th Cir.) (in banc), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). Thus, under the decree, rarely, if ever, will non-minority employees be "bumped" from jobs they already have. Also, hiring requirements will be phased in so as to avoid undue disruption to employers and non-minority operating engineers.

In sum, this decree is entered with the hope and intention of providing as complete an injunctive remedy as is possible for the victims of past discrimination while not impinging unnecessarily upon the rights of others and while maintaining a significant degree of flexibility so that the require-ments of the decree may be adjusted to best vindicate the rights of all involved.

### III.

Despite my responsibilities for the last two years as a circuit judge, I have nevertheless continued my assignment on this case by special designation by the Chief Judge of the United States Court of Appeals for the Third Circuit. I willingly accepted this assignment because of my hope that I could aid in its amicable resolution and because of my desire that even if the case was not settled it could go to another judge who would not have to resolve the complex and intricate liability and decree issues which have been presented to me over a period of years. The case is now in the posture where it can be efficiently reassigned with minimum difficulty since all of the liability issues and the decree issues have been decided. I will therefore ask Chief Judge Lord to reassign this case to a district judge for resolution of the damage phase. I am willing to consider any request by the parties that I decide the issues of counsel fees on the liability phase of this case.[4]

As I close my responsibilities on this case, I extend my best wishes to all of the parties. I trust that in the future they can be as effective in settling this case as they have been vigorous in litigating it.[5]

---

3. Although I made no specific findings in my opinion on liability with respect to discrimination in the hiring of master mechanics and assistant master mechanics, the evidence presented at trial of pervasive discrimination limiting access by minorities to union entry, referral and skill development necessarily had the result of limiting minority access to the prestigious and high-paying jobs of master mechanic and assistant master mechanic. To the extent necessary, this may be considered an amendment of my earlier findings of fact and conclusions of law.

4. Since I am not certain as to whether paragraphs 23 and 24 of the decree adequately protect the rights of the minority graduates of Benjamin Franklin I and II, I will consider amending those portions of the decree if plaintiffs demonstrate by the factual presentation of *actual* cases that the decree does not provide adequate relief for those Benjamin Franklin graduates who are willing to work *now* or are willing to participate in retraining programs.

5. For other phases of this litigation see *Commonwealth of Pa. v. Local 542,* 347 F.Supp. 268 (E.D.Pa.1972), *aff'd,* Docket No. 72–1901 (3d Cir. May 21, 1973); *Commonwealth of Pa. v. Local 542,* 388 F.Supp. 155 (E.D.Pa.1974), Docket No. 74–2281 (3d Cir. Dec. 30, 1974) (denying petition for writ of mandamus); Order (3d Cir. Feb. 25, 1975) (denying petition for stay pending application for certiorari), *cert. denied,* Docket No. 74–1272 (U.S. June 9, 1975); *Commonwealth of Pa. v. Local 542,* Docket No. 74–1772 (3d Cir. July 27, 1975) (order denying petition for writ of mandamus and for writ of prohibition), *cert. denied,* Docket No. 74–1557 (U.S. July 27, 1975); *Commonwealth of Pa. v. Local 542,* Docket No. 76–1290 (3d Cir. March 10, 1976) (order denying motion for stay); Order, (3d Cir. March 12, 1976) (order denying writ of mandamus); *Common-*

wealth of Pa. v. Local 542, Docket No. 76–1331 (3d Cir. March 17, 1976) (order denying supplemental petition for writ of mandamus and the supplemental petition for stay); *Commonwealth of Pa. v. Local 542*, 73 F.R.D. 544 and 551 (E.D.Pa.1976), *aff'd*, 552 F.2d 498 (3d Cir.), *cert. denied sub nom., Freedman v. Higginbotham*, 434 U.S. 822, 98 S.Ct. 67, 54 L.Ed.2d 79 (1977).