**COMMONWEALTH OF PENNSYLVA-NIA and Ronald Williams, et al.**

v.

**LOCAL 542, INTERNATIONAL UNION OF OPERATING ENGINEERS, et al.**

Civ. A. No. 71–2698.

United States District Court, E.D. Pennsylvania.

Oct. 9, 1985.

**18.** See page 4, *supra*.

**19.** See *supra* note 6.

Harold I. Goodman, Philadelphia, Pa., for Raymond Williams, et al.

Edward D. Foy, Jr., Richboro, Pa., for Local Union 542.

Thomas J. McGoldrick, King of Prussia, Pa., for JATC.

## MEMORANDUM

BECHTLE, District Judge.

Following a hearing held on July 30, 1985, this court ordered that the "Judgment and Decree" originally issued by this court on November 7, 1979, as revised on August 12, 1983 (Post Decree Order # 73), which was to expire on August 31, 1985, be extended for two years. After a review of the Special Master's Report, and the exhibits and arguments propounded by the parties, the court finds it necessary to make certain modifications to the Judgment and Decree.

## I. FACTS

The facts of this prolonged litigation have previously been articulated by this court. *See Commonwealth of Pennsylvania v. Local 542*, 569 F.Supp. 582, 583–86 (E.D.Pa.1983). A brief summary of the facts, however, is in order.

This action was instituted on November 8, 1971, by 12 black men and the Commonwealth of Pennsylvania. It challenged a

pattern and practice of racial discrimination against minorities, as a class, by Local 542, International Union of Operating Engineers ("Local 542" or the "Union"), the Joint Apprenticeship Training and Safety Committee ("JATC"), and the contractors and contractor associations that entered into collective bargaining agreements with Local 542.

On January 2, 1979, the court[1] issued its decision that minorities, as a class, had been victims of intentional racial discrimination by Local 542 and the JATC by the denial to minorities of equal treatment in entry to the Union and to minority members of the Union in obtaining referrals to jobs, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. *Commonwealth of Pennsylvania v. Local Union 542,* 469 F.Supp. 329 (E.D.Pa.1978) (liability opinion), *aff'd as to Local 542,* 648 F.2d 922 (3d Cir.1981).[2] The court also held that the contractor associations and contractors were liable under 42 U.S.C. § 1981 because of their contractual relationship to the Union hiring hall. *Id.* The court's finding of vicarious liability on the part of the contractor associations and contractors was reversed by the United States Supreme Court. *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

On November 7, 1979, the court issued an injunction, called a "Judgment and Decree" (the "Decree"), which prohibited any further discrimination by Local 542 and the

JATC.[3] That injunction also set specific minority goals, spread over five years, to bring about racial integration in the operating engineers trade and equal employment opportunities for those minorities who are or wish to become members or affiliates of Local 542 and the JATC. *Commonwealth of Pennsylvania v. Local Union 542,* 502 F.Supp. 7 (E.D.Pa.1979). The hour and wage percentage goals for the five-year duration of the Decree were as follows:

|  | 1st year | 2nd year | 3rd year | 4th year | 5th year |
|---|---|---|---|---|---|
| District 1 | 12 % | 14 % | 16 % | 18 % | 18 % |
| District 2 | 1.1% | 1.3% | 1.3% | 1.3% | 1.3% |
| District 3 | .5% | .7% | .7% | .7% | .7% |
| District 4 | 2 % | 2.6% | 2.8% | 2.8% | 2.8% |
| District 5 | 8 % | 10 % | 12 % | 12.4% | 12.4% |

Following a series of hearings in March, April and May 1985, before the Special Master,[4] a report was submitted to the court by the Master concerning Local 542's compliance with the Decree during years 4 and 5, and making recommendations concerning extending the Decree. Having thoroughly reviewed the Master's report and having had a hearing and heard argument from all parties on July 30, 1985, the court finds that the Masters' findings are not clearly erroneous. That is to say, the court concludes that the Master heard and considered all of the evidence and arguments offered by the parties and made thoughtful, reasonable and proper findings of fact. The Master was totally justified in accepting the facts and figures in the plaintiff's testimony and exhibits as being accurate and as a basis for recommendations to

---

1. United States District Judge A. Leon Higginbotham was the judge assigned to the case until December 7, 1979 when it was transferred to United States District Judge Louis C. Bechtle by reason of the elevation of Judge Higginbotham to the United States Court of Appeals for the Third Circuit.

2. The court's liability opinion was actually filed on November 30, 1978, but was impounded until January 2, 1979 in hopes of maximizing the chances for settlement.

3. The Judgment and Decree was actually filed on August 8, 1979. In the hope of fostering a settlement, the court impounded the Judgment and Decree and didn't release it until November

7, 1979. *See Commonwealth of Pennsylvania v. Local Union 542,* 488 F.Supp. 988 (E.D.Pa.1980), where the court explains the impoundment and settlement process and elucidates the purpose and basis of the August 8, 1979 Judgment and Decree. The Judgment and Decree was revised on August 12, 1983 (Post Decree Order # 73), which has become the operative document in this action. All references to the Judgment and Decree in this opinion shall be to the revised Decree found in Post Decree Order # 73.

4. On March 25, 1980 Judge Louis C. Bechtle appointed, pursuant to Fed.R.Civ.P. 53, Frank W. Jenkins, Esquire, as Special Master for the purpose and for the reasons set forth in the Court's Order of appointment.

the court. The court accordingly accepts essentially what the Master states in his report, including the history of the case, recall features, statistical presentations, etc., and hereby adopts the following findings and conclusions:

## II. FINDINGS AND CONCLUSIONS

1. There has been a serious shortfall in wages and hours for minorities required by the Decree in District 1 and District 5 for years four and five, to wit:

| | District 1 | | District 5 | |
| --- | --- | --- | --- | --- |
| | 4th year | 5th* year | 4th year | 5th* year |
| Applicable Goal Under Decree | 18.0% | 18.0 % | 12.4% | 12.4 % |
| Actual Minority % | 12.1% | 13.43% | 8.0% | 10.10% |

* September 1984—May 1985

This represents a total wage shortfall for the two districts in years four and five combined of approximately $4,101,727.00.

2. The wages and hours goals for years four and five could have been met.

3. In Post Decree Order # 78 the court ordered an increase in referrals[5] of minorities to jobs in order to rectify an apparent inability to achieve the necessary hours and wages for minorities. Thereafter, minority referrals in District 1 were to be at the rate of 40 percent of all referrals to achieve the wages and hours goal for year five, that goal being 18 percent. Since the issuance of Post Decree Order # 78, however, the actual referrals to minorities has actually *decreased* to 26.5 percent in year 5 from 27.47 percent in year 4. There were, in fact, enough minority operators on the out-of-work list at the Union's hiring hall available so that 40 percent of all referrals could have been to minorities. Had 40 percent of all referrals gone to minorities, there was at least a chance that the 18 percent of hours and wages could have been met.[6]

4. The court finds that the employer recall provision found in the collective bargaining agreement has had, and will continue to have, a material adverse impact on the Union's ability to meet the referral goals, and therefore the wages and hours goals of the Decree. In District 1, for example, in the period from July 30, 1984, through July 26, 1985, there was a total of only 27.06 percent minority referrals (i.e., dispatches and recalls)—well below the court mandated 40 percent. Employer recalls made up 53 percent of all referrals,

---

5. It is essential to an understanding of this opinion that the special terms "referral", "dispatch" and "recall" be defined as they have been used and will be used in the context of this case. "Referrals" are composed of "dispatches" and "recalls."

A "dispatch" (also referred to as *hiring hall dispatch* for clarity and emphasis) is an internal feature of the hiring hall in which Union members are "dispatched" to prospective employers based solely on the Union member's position on the out-of-work list. Hiring hall dispatches are under the exclusive control of the Union.

A "recall" (also referred to as *employer* recall" for clarity and emphasis), on the other hand, is a feature of the employer/employee relationship as found in the collective bargaining agreement. The employer recall provision allows the employer to recall (but it must be through the Union hiring hall) any Union employee laid off within the preceeding ninety (90) calendar days. Because, at least on the surface, employer recalls are initiated by the employer, employer recalls are under the control of the employer, not the Union.

In Post Decree Order # 80 the court defined referral, for purposes of this Decree, as including:

[A]ll [hiring hall] dispatches by the union members which result in offers of employment from an employer-contractor, regardless of whether the minority union member accepts the offer of employment. "Referral" does *not* include an unsuccessful [dispatch] attempt by the union to contact a minority union member regarding a possible employment. A[n] [employer] recall by a contractor-employer shall be considered a "referral" for purposes of this Decree.

6. There is not a direct correlation between the percentage of minority referrals and the percentage of minority wages and hours. Forty percent minority referrals will not result in 40 *percent minority wages and hours.* This is because of the nature of the work assigned, i.e., different durations of employment, skill qualifications, etc. The court has found that in District 1, for example, 40 percent minority referrals is necessary to meet the ultimate goal of 18 percent minority hours and wages. There is a similar pattern in the other districts.

the remaining 47 percent being hiring hall dispatches. Of all employer recalls, only 13.3 percent were to minorities. Consequently, the percentage of minority hiring hall dispatches (42.5%) was so adversely affected by the percentage of minority employer recalls (13.3%) that the sum total minority referrals was only 27.06 percent. In other words, without the employer recall feature, the Union would have met the court mandated 40 percent minority referrals for District 1. Clearly, the recall provision in the collective bargaining agreement is a major obstacle to the Union's ability to meet the goals of the Decree, thereby encroaching into the minorities opportunity for hours worked to an unacceptable degree.

The power of this court to alter provisions in the collective bargaining agreement which effect the ability of the Union to comply with the Judgment and Decree was specifically upheld by the Supreme Court *in this very case* in *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Justice Rehnquist clearly defined the district court's remedial powers:

> To the extent that the remedy properly imposed upon the Union and the JATC requires any adjustment in the collective bargaining contract between [the employers] and the Union, *it is entirely appropriate for the District Court to fashion its injunctive remedy to so provide,* and to have that remedy run against … the Union and the JATC.

458 U.S. at 400, 102 S.Ct. at 3155 (emphasis added).

In reference to the referral system *in this very case,* the Third Circuit recently stated:

> Here, *where the referral system itself was the mechanism for intentional discrimination,* there is no bona fide seniority system, and therefore there are no legitimate expectations based on the referral system. Where a seniority system has been maintained with discriminatory intent, those individuals who gain seniority within the system are direct, intentional beneficiaries of the illegal discrimination; *their "expectations are therefore illegitimate, and do not warrant protection."*

*Commonwealth of Pennsylvania v. Local Union 542,* 770 F.2d 1068, slip op. at 12–13 (3d Cir.1985) (emphasis added).

█ In light of this court's finding that the employer recall provision of the collective bargaining agreement is an obstacle, from all vantage points, to compliance with the Judgment and Decree, and because the reasons given for the need of a ninety-day recall period are obscure and in any event substantially outweighed by the interference it poses to the court's Decree, the ninety (90) day recall rule could be removed entirely, but for the time being will be reduced to thirty (30) days. Hereafter, an employer may only recall an employee laid off within the preceeding thirty (30) calendar days, notwithstanding *any* provision in any collective bargaining agreement to the contrary. The court anticipates that this will increase the percentage of total minority referrals. After a satisfactory period of time, the court will re-evaluate the affect the thirty (30) day employer recall rule is having on the Union's ability to meet the goals of the Decree and, if necessary, make further adjustments to this provision of the collective bargaining agreement.

█ 5. The union was given five years in which to prove to this court that it could operate the hiring hall in a non-discriminatory, fair and equitable manner. The court finds that the union has failed in this regard and to the contrary, has continued to use the hiring hall as a tool of discrimination, albeit at a reduced level, but discrimination nevertheless. For this reason, the court will appoint a full-time Hiring Hall Monitor, directly responsible to the Court, who will be given full authority to operate and oversee all features of the hiring hall. In accordance with Fed.R.Civ.P. 53, the compensation to be allowed to the Hiring Hall Monitor shall be fixed by the court and shall be paid by Local 542.

■ 6. Paragraph 19(a) of the Judgment and Decree (as revised) provides:

Defendant Local 542 shall develop and present to the Court for approval valid, job-related criteria for admission to the union for each method of entry through which membership can be attained, including affiliation via the Registrant Program. Validation shall be, to the extent feasible, in accordance with the "Uniform Guidelines on Employee Selection Procedures" as promulgated by the Equal Employment Opportunity Commission on August 25, 1978, 43 Fed.Reg. No. 166, at 38290 *et seq.* The Plaintiffs shall have the opportunity to present their position on the legality and validity of any of these proposed criteria.

Paragraph 34 of the Judgment and Decree (as revised) provides, in pertinent part:

The Defendants shall develop, adopt and implement non-discriminatory and job-related standards for the positions of master and assistant master mechanics. Once developed, these standards shall be submitted to the Court for approval, with prior submission to Plaintiffs for their comments, or objections, if any.

Post Decree Order # 81, issued on September 27, 1984, ordered:

It is also ordered that defendants complete and submit to plaintiffs and the court, within thirty (30) days of the date of this Order, the remaining validation project with respect to each of the methods of entry into the union as well as any additional work to be completed on the master and assistant master mechanic validation report.

Local 542, in blatent and confrontational contempt of these court mandates, has failed to do *any* of the validation work required of it. This court no longer believes the union is willing to make, or to even try to make any measurable effort to develop a satisfactory validation plan. Consequently, the court concludes that the Union has forfeited its opportunity to develop and submit validation material of its own, and by the accompanying Order, will appoint Dr. Felix Lopez to enter upon and complete a validation plan, subject to the approval of this court. Dr. Lopez's fees will be paid by the Union.

■ 7. It is evident that Local 542 has not met many of the goals of the Judgment and Decree. Therefore, the court will hold defendants in contempt for failing to satisfy court mandates respecting work levels for minorities, as well as its failure to do the validation work. The Union's performance cannot be excused because the figures show improvement. The degree of improvement is patently and substantially out of proportion to the levels of compliance that *could* have been achieved with the resources and experience, and time allowed by the court to perform. The Union's efforts have been mediocre, lackluster and, in the Court's view, calculated to show the minimum of change at the least cost to the Union's continuous program of wearisome and intentional racial discrimination.

In accordance with the above, an appropriate Modification Decree will be entered.

## MODIFICATION DECREE

### I. *Duration and Effective Date*

1. The Judgment and Decree (as revised) is extended, in all five (5) districts, for two (2) years, beginning on September 1, 1985. The provisions of this Modification Decree are effective immediately. The Judgment and Decree as modified by this Modification Decree shall terminate on August 31, 1987, unless, prior to that date, good cause is shown for an extension of any provisions of the Decree or for their earlier termination.

### II. *Goals*

2. It shall be the goal of this Decree that the number of hours worked by minorities equal the percentages of the total

hours worked in each district and in each year as set out below:

| | Year 6 (Sept. 1, 1985 to Aug. 31, 1986) | Year 7 (Sept. 1, 1986 to Aug. 31, 1987) |
|---|---|---|
| District 1 | 18 % | 18 % |
| District 2 | 1.3% | 1.3% |
| District 3 | .7% | .7% |
| District 4 | 2.8% | 2.8% |
| District 5 | 12.4% | 12.4% |

### III. *Referrals*

3. Post Decree Order #78 is to remain in effect for the duration of the Decree, to wit, 40 percent of all referrals are to go to minorities in District 1, and 17 percent of all referrals are to go to minorities in District 5.

### IV. *Recall Provision*

4. In light of the court's finding that the employer recall provision in the collective bargaining agreement has had, and will continue to have, a material adverse impact on the Union's ability to meet the goals of the Decree, the ninety (90) day recall rule found in the collective bargaining agreement will be reduced to thirty (30) days. An employer may only recall an employee laid off within the preceding thirty (30) calendar days, notwithstanding any provision in the collective bargaining agreement to the contrary, unless specifically authorized by the Hiring Hall Monitor.

### V. *Hiring Hall Monitor*

5. Pursuant to Rule 53 of the Federal Rules of Civil Procedure, the court shall designate a full-time Hiring Hall Monitor, to be paid at Local 542's expense, with full authority to operate and oversee *all* features of the hiring halls in the five districts.

6. The Hiring Hall Monitor, in addition to his primary authority to oversee all five districts, shall be responsible for running the day to day operations of the hiring hall in District 1, the district with the greatest number of minorities. The Hiring Hall Monitor is authorized to appoint hiring hall leaders to run the day to day operations in the hiring halls in the remaining four districts, all of whom are directly responsible to the Hiring Hall Monitor.

7. The Hiring Hall Monitor will have the authority to approve of or disapprove of all referrals, including hiring hall dispatches and employer recalls. The Hiring Hall Monitor's authority to approve a recall request by an employer which extends beyond the thirty (30) day recall period set by this Decree, shall be limited to "truly extraordinary circumstances."

8. The parties are to convene together with the Hiring Hall Monitor to identify with particularity what the court envisions to be a very few "truly extraordinary circumstances" which would justify such an exception to the thirty (30) day rule. The Hiring Hall Monitor is to submit these guidelines in writing to the court within ninety (90) days of the date of this Modification Decree.

9. The Hiring Hall Monitor shall submit to the Master bi-monthly reports with copies to counsel for all parties, setting forth sufficient information regarding referrals, including a breakdown of minority hiring hall dispatches and employer recalls for the previous two month period.

10. A separate Post Decree Order will be entered appointing the Hiring Hall Monitor, summarizing his/her qualifications for this position, and setting forth the compensation he/she is to be paid.

### VI. *Validation*

11. In light of the court's finding defendants in contempt of paragraphs 19(a) and 34 of the Judgment and Decree (as revised) and Post Decree Order #81, pursuant to Fed.R.Civ.P. 53, the court hereby appoints, at defendants' expense, Felix Manual Lopez, Ph.D., to enter upon and complete a validation plan with respect to each of the methods of entry into the Union as well as developing non-discriminatory, job-related standards for the positions of master and assistant master mechanics.

12. Dr. Lopez is to submit to the court within 60 days of the date of this Modification Decree, a proposed plan to enter upon and complete the validation plan.

13. Once the validation plan is developed it shall be submitted to the court for approval, with prior submission to both plaintiffs and defendants for their comments, or objections, if any.

14. A separate Post Decree Order will be entered summarizing Dr. Lopez's qualifications for this position, and setting forth the compensation he is to be paid.

VII. *The Role of the Master*

15. In light of the court's appointment of a Hiring Hall Monitor to oversee the day to day operations of the hiring hall referral system, the Master is directed to shift his emphasis to the Training and Upgrading Program. Nonetheless, the Master retains all authority given to him under the Judgment and Decree (as revised). To the extent the authority and duties of the Master and Hiring Hall Monitor overlap or conflict, they are authorized to mutually resolve such conflicts. A written explanation of such resolutions are to be forwarded to the court, with a copy sent to counsel for all parties.

VIII. *Training and Upgrading Program*

16. The court has received the Master's report on the Training and Upgrading Program ("Program") and has taken the Master's recommendations under advisement. The court will issue a separate Post Decree Order modifying the Program if it finds it necessary to do so. In the interim, the Program is to continue unmodified for the duration of the Decree.

IX. *Effect of Modification Decree on Judgment and Decree*

17. All provisions of the Judgment and Decree (as revised) not inconsistent with this Modification Decree shall remain in force.