COMMONWEALTH OF PENNSYLVA-
NIA and Raymond Williams, Willie
McKay, Marion J. Eaddy, Randolph
Hughes, Jr., Arel Brownlee, William
Bostic, Kenneth Howard, Alpha Christ-
mas, Ronald Richardson, Clarence
Winder, Ronald Crawford and Frank
Gilchrist, on their own behalf and on
behalf of all others similarly situated,
Plaintiffs,

v.

LOCAL UNION 542, INTERNATIONAL
UNION OF OPERATING ENGINEERS;
Operating Engineers Joint Apprentice-
ship and Training Committee of Phila-
delphia, Eastern Pennsylvania, and The
State of Delaware; General Building
Contractors Association, Inc., Contrac-
tors Association of Eastern Pennsylva-
nia, United Contractors Association,
and Pennsylvania Excavating Contrac-
tors Association, on their own behalf,
and on behalf of all others similarly
situated, and Glasgow, Inc., on its own
behalf and on behalf of all others sim-
ilarly situated, Defendants.

Appeal of LOCAL 542, INTERNATION-
AL UNION OF OPERATING
ENGINEERS.

Nos. 85–1540, 85–1706.

United States Court of Appeals,
Third Circuit.

Argued Sept. 17, 1986.

Decided Dec. 5, 1986.

* Honorable Robert E. Cowen, United States Dis-
trict Judge for the District of New Jersey, sitting

Cowen, District Judge, sitting by des-
ignation, filed dissenting opinion.

Robert M. Weinberg (argued), Jeremiah
A. Collins, Bredhoff & Kaiser, Washington,
D.C., Edward A. Foy, Jr., Liederbach, Ros-
si, Hahn, Casey & Foy, Richboro, Pa., for
appellant.

Harold I. Goodman (argued), Community
Legal Services, Inc., Philadelphia, Pa., for
appellees.

Before ADAMS and STAPLETON, Cir-
cuit Judges and COWEN, District Judge *.

**OPINION OF THE COURT**

STAPLETON, Circuit Judge.

In these consolidated appeals, Local Un-
ion 542, International Union of Operating

by designation.

Engineers, ("Local 542" or "the Union") challenges the district court's extension of an injunctive decree first imposed on the Union in 1979, after a finding of intentional employment discrimination by the Union against minority workers. Specifically, the Union objects to the minority job referral levels that the extended decree requires. Because we do not believe that the district court abused its discretion in extending the decree, including its referral requirements, for two additional years, we affirm.

## I.

The elaborate factual foundation for holding the Union liable in this case is recited at length in previous opinions that have emerged from this fourteen-year-old litigation. The Union here challenges only the extended injunction imposed after the district court determined that the initial decree's requirements had not been met. Because the factual background is set forth extensively in prior opinions, we can treat the long history of this case briefly. The most relevant facts for this appeal are the lower court's findings of continuing discrimination and the provisions of the extended decree.

The district court in 1978 found Local 542 liable for intentional, classwide discrimination against minority workers in violation of both Title VII and 42 U.S.C. § 1981. *Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Engineers*, 469 F.Supp. 329 (E.D.Pa.1978), *aff'd*, 648 F.2d 922 (3d Cir.1981) (en banc). The court found discrimination by the Union in entry into the Union as well as in job referrals from the Union's exclusive hiring hall. *Id.* The court then entered an injunctive decree, effective November 7, 1979, to remedy the Union's unlawful conduct. *Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Engineers*, 502 F.Supp. 7 (E.D.Pa.1979) (the injunction), *aff'd*, 648 F.2d 922 (3rd Cir. 1981); *Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Engineers*, 488 F.Supp. 988 (E.D.Pa. 1980) (opinion in support of the injunction),

*aff'd*, 648 F.2d 922 (3rd Cir.1981). Contractors that relied on Local 542's hiring hall were initially found vicariously liable by the district court, but the Supreme Court reversed this holding, *General Building Contractors v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), thus invalidating the part of the injunctive decree that applied to the class of contractors. After this decision the obligations of the Union remained unchanged, except for the decree modifications discussed below.

The injunctive decree's ultimate objective was to achieve, at the end of its life, a level of hours worked by minority Union members commensurate with the percentage of minority persons in the local workforce population. The decree established a different hours goal for each of five districts where the Union operated. The hours goals increased over the five-year period of the initial decree. To assure that the hours goals would be met, the district court imposed subsidiary obligations on the Union. One of the subsidiary obligations, the referral level (specified for each district), established the rate at which minority members were to be referred to jobs from the Union hiring hall. "Referrals" include dispatches from the hiring hall's out-of-work lists and recalls of preferred employees by employers.

The Union's collective bargaining agreements give employers the right to recall a preferred employee during a 90–day period after the employee is laid off by the employer. Thus during the recall period the employer can hire a Union member who is out of work but has worked previously for the employer, giving the employer some control over who is sent from the hiring hall. If the employer does not recall a particular worker, the Union dispatches a member from its out-of-work list.

At the outset, the referral levels of the injunction (i.e., the ratio of minority referrals to total referrals) were set at the same percentage as the yearly hours goals for each district (i.e., the ratio of minority hours worked to total hours worked), with a provision in the injunction that referral

levels could later be increased if necessary to achieve the appropriate level of minority hours worked. To reach a desired level of minority work hours, referral levels must be set higher if the number of hours worked per referral is on the average higher for white workers. In this case, white Union members have consistently been referred to longer jobs. When the district court found that the initial referral levels resulted in a shortfall in minority hours worked, the court altered the referral obligations. Thus in 1983, the court set aside 22% of the referrals in District 1 for minority workers during the last two years of the initial decree, instead of 18%, the ultimate hours-worked goal for that district. In 1984, the court raised the referral level in District 1 to 40% for the remainder of the initial decree's life. Of the injunction's five districts, District 1 is the district with the greatest percentage of minorities, 18%, in its workforce population.

As the years of the initial decree passed, the Union met neither the referral nor the hours-worked specifications of the decree. The Union also did not comply with integrated membership and validation requirements. The Master, appointed by the district court to oversee implementation of the decree, conducted evidentiary hearings in early 1985 and issued a detailed report that recommended *inter alia* extending the time period of the decree. The Master's Report states,

> The purpose of the Judgment and Decree was to assure the plaintiff class of adequate representation within the construction industry and more particularly in the endeavors of Operating Engineers.... This purpose has not been met. The Court found that the plaintiff class was entitled to this injunctive relief, and it is the finding of the Master after these years of experience, that the plaintiffs are still entitled to that relief and that the percentages mandated by the Court are reasonable goals.

App. at 31. On July 30, 1985, the district court heard argument on whether to accept the Master's recommendations. At the conclusion of this argument, the court issued an order dated August 1, 1985, extending the injunctive decree for two years, to August 31, 1987, subject to modifications to be made by the court. An order dated October 9, 1985, sets out the district court's findings and its modifications of the injunction. The Union appeals from the August 1 and October 9, 1985, orders.

The district court found "a serious shortfall" in the amount of work done by minorities during the last two years of the initial decree, the time period during which minorities were to achieve work levels commensurate with the number of minorities in the local workforce population. App. at 671. The court calculated that from September, 1983, to May, 1985, minority workers in District 1 and District 5 lost $4,101,727.00 in wages because of discrimination in the allocation of the Union's work. App. at 672. Furthermore, the court found that since it had ordered 40% minority referrals for District 1, the referral level "actually *decreased* to 26.5 percent in year 5 from 27.47 percent in year 4." App. at 673 (emphasis in original). The court concluded that the Union "has continued to use the hiring hall as a tool of discrimination." App. at 676. It also found that "Local 542, in blatant and confrontational contempt of the court mandates, has failed to do *any* of the validation work required of it." App. at 677 (emphasis in original). Finally, the court held the Union "in contempt for failing to satisfy court mandates respecting work levels for minorities, as well as its failure to do the validation work." App. at 677. Judge Bechtle reasoned,

> The degree of improvement is patently and substantially out of proportion to the levels of compliance that *could* have been achieved with the resources and experience, and time allowed by the court to perform. The Union's efforts have been mediocre, lackluster and, in the Court's view, calculated to show the minimum of change at the least cost to the Union's continuous program of wearisome and intentional racial discrimination.

App. at 677–78 (emphasis in original).

The extended decree has as its ultimate goal, as did the initial decree, minority

work hours that reflect the number of local minority workers. To assist the Union in complying with the decree and ending discrimination, the extended decree requires the appointment of a Hiring Hall Monitor. It also orders Felix Manual Lopez, Ph.D., to formulate a validation plan for non-discriminatory entry and promotion standards, at the Union's expense.

In addition, the extended decree maintains for two years the referral requirements established in 1984—40% minority referrals in District 1, for example, and 17% in District 5. Because Judge Bechtle found "that the employer recall provision in the collective bargaining agreement has had, and will continue to have, a material adverse impact on the Union's ability to meet the goals of the Decree," however, he ordered that the recall provision be altered to restrict recalls to within 30 days from previous employment with a particular employer. As noted earlier, the collective bargaining agreements as signed by the contractors and the Union give the employers the recall privilege for 90 days. In modifying the initial decree Judge Bechtle further provided,

> The Hiring Hall Monitor will have the authority to approve of or disapprove of all referrals, including hiring hall dispatches and employer recalls. The Hiring Hall Monitor's authority to approve a recall request by an employer which extends beyond the thirty (30) day recall period set by this Decree, shall be limited to "truly extraordinary circumstances."

App. at 681.

The Union in these appeals challenges the extended referral requirements, arguing that the District 1 hiring hall must under the extended decree dispatch minority workers at a rate of 70%, that the referral requirements unjustifiably hurt white workers who may not have benefited unfairly from discrimination in the past, and that the employers, not the Union, are responsible for the minority work shortfall. The Union emphasizes the Master's finding with respect to the last years of the initial decree:

There were, in fact, enough minority operators available for work so that the 40 per cent referral could be met. In order to achieve that, in excess of 70 per cent of all *dispatches* would have to be to minority operators. . . .

. . . . .

Certainly, the fact that it would require in excess of 70 per cent of all dispatches from the hiring hall to be given to minorities and that each one of those dispatches would have required a job of some 199 hours in length, is evidence of the difficulty the Union experiences in trying to comply. The plaintiffs point out, however, that such an effort on behalf of the Union was not even tried. There was at no time dispatches of minorities approaching 70 per cent even though the testimony indicates there were minorities available for work, many on the out-of-work list, that could have been dispatched in order to meet the quotas. It is also obvious to all parties involved and, essentially agreed to, that had the contractors been kept in the case, sharing the responsibility with the Union for meeting the hours and wages goal, that the effort would have been less onerous.

App. at 18, 26 (emphasis in original). The high dispatch level required to meet the decree's referral goals resulted from the employers' practice of more frequently recalling white workers. Because the practice of favoring whites for recalls continues, argues the Union, the extended decree imposes an unfair burden on Local 542 and on its white workers who are not recalled regularly. The Union presents itself as powerless to control the employers' right to recall:

The recall right is a contractual prerogative that is jealously guarded by the employers, and plaintiffs offer no evidence to suggest that the Union has ever been deemed to have the right to reject a recall that is requested within the period specified by the contract (originally 90 days, and now 30 days). Nor does anything in the Decree purport to authorize

the Union to disregard the employers' contractual right to recall employees. Appellant's Reply Brief at 13–14 (footnote omitted). Local 542 asks this court to vacate the extended decree's referral requirements and to instruct the district court to set such requirements no higher than the percentage of minority members in the Union membership of each district.

## II.

Local 542 does not challenge the district court's power to modify and extend its injunction. *See United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968) (district court should modify decree if required result not achieved). Nor does the Union dispute the proposition that the Supreme Court has approved the use of affirmative, race-conscious remedies for persistent employment discrimination under some circumstances. *See Local 28, Sheet Metal Workers v. EEOC,* —— U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (holding that race-conscious goals are among tools available to judges devising remedies for Title VII violations, and citing *Pennsylvania v. International Union of Op. Engineers*, 770 F.2d 1068 (CA 3 1985) (this case), as example). Finally, the Union does not challenge the district court's findings of fact as clearly erroneous. The Union does assert, however, that Judge Bechtle abused his discretion when he extended the race-conscious referral goals for two years, based on the injunction's failure so far to achieve its goal of equal employment opportunity.

We review the district court orders for abuse of discretion. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 770, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976) (fashioning employment discrimination remedy invokes equitable discretion of district court). Under the abuse of discretion standard, we may reverse the lower court only if the extended decree is arbitrary, capricious, or irrational, or it employs improper standards, criteria, or procedures. *See Hoots v. Commonwealth of Pennsylvania*, 703 F.2d 722, 725 (3d Cir.1983). As

the plurality opinion in *Local 28, Sheet Metal Workers* emphasizes, the district court's discretion "should be guided by sound legal principles." 106 S.Ct. at 3050.

Justice Brennan's opinion and Justice Powell's opinion in *Local 28, Sheet Metal Workers*, together expressing the views of five members of the Court, focus on several factors to be considered in determining the propriety of race-conscious, prospective relief for Title VII violations. The affirmative race-conscious remedy in that case fit within Title VII's authorization because it (1) addressed persistent, egregious, or pervasive discrimination, (2) was flexible in application, (3) constituted a temporary measure, and (4) failed to trammel unnecessarily the interests of white workers. 106 S.Ct. at 3050–52 (Brennan, J., joined by Marshall, J., Blackmun, J., and Stevens, J.); *see also* 106 S.Ct. at 3054 (Powell, J., concurring in the judgment) ("in cases involving particularly egregious conduct a District Court may fairly conclude that [a negative] injunction alone is insufficient to remedy a proven violation of Title VII. This is such a case."). In addition, the plurality found that the remedy satisfied "even the most rigorous [equal protection] test—it is narrowly tailored to further the Government's compelling interest in remedying past discrimination." 106 S.Ct. at 3053 (Brennan, J., joined by Marshall, J., Blackmun, J., and Stevens, J.). The plurality explicitly declined to hold, however, that this most stringent test was in fact the proper test to be applied in analyzing the constitutionality of race-conscious remedial measures. 106 S.Ct. at 3052–53. In his determination that the remedy in *Local 28, Sheet Metal Workers* was narrowly tailored, Justice Powell relied on the lack of any other effective remedy, the temporary nature of the remedy, the direct relation between the goal and the percentage of minorities in the relevant workforce, the flexible application of the remedy, and its failure to disadvantage white workers. 106 S.Ct. at 3055–57.

We examine the remedy in this case to see that it meets Justice Brennan's four

criteria for an appropriate remedy under Title VII and, as did the plurality, we assume that the Constitution requires a narrowly tailored remedy. Although the referral levels here seem at first blush to be a more drastic remedy than the 29% membership goal in *Local 28, Sheet Metal Workers*, careful examination of the circumstances shows that this remedy is not at variance with the analysis used by the Supreme Court to uphold the membership goal. In addition, the Union, focusing on injury to white workers and lack of fit between remedy and problem, has raised no consideration unanticipated by the Court in *Local 28, Sheet Metal Workers*.

Each factor that led to the affirmance in *Local 28, Sheet Metal Workers* is also present in the case before us. First, Judge Bechtle's memorandum in support of his orders makes clear that extending the decree addresses persistent discrimination. He found that the hiring hall still serves as a "tool of discrimination." App. at 676. The referral requirements have been extended by Judge Bechtle in an effort to end at last the Union's proven discriminatory ways. Therefore, they are not merely racial balancing measures, measures that the Court in *Local 28, Sheet Metal Workers* indicated would be inappropriate under Title VII. 106 S.Ct. at 3038 (Brennan, J., joined by Marshall, J., Blackmun, J., and Stevens, J.) (citing legislative history).

Second, Judge Bechtle treats the referral requirements as flexible goals rather than as strict quotas that can, in and of themselves, result in Union contempt citations. In its October order the district court held the Union in contempt for failure to achieve work levels that, given the actual circumstances, could have been achieved. Neither the failure to meet the minority hours goals nor the failure to meet the subsidiary referral goals mechanically triggered the contempt ruling. Rather, the court sanctioned the Union for efforts "calculated to show the minimum of change at

the least cost to the Union's continuous program of wearisome and intentional racial discrimination." App. at 677–78. Furthermore, the court has been flexible in setting the Union's referral requirements and in aiding compliance with them. Because the court found that the recall privilege frustrated the Union's performance under the decree, it restricted this privilege in the course of extending the decree. The court also stated that it would reevaluate the recall privilege's impact after the 30–day time limit went into effect, and that it would make further adjustments if necessary. App. at 675. Referral levels have been repeatedly reexamined and have been set at the estimated level necessary for hours of minority work that match the percentage of minorities in the workforce population.[1] The lower court uses the referral levels to gauge achievement of the ultimate goal, work levels consistent with overcoming the Union's past discrimination.

The court has shown its willingness to aid the Union in any way possible as Local 542 attempts to increase minority referrals and thus minority work, even to the point of doing away with the recall privilege altogether. An injunctive decree under Title VII can alter the Union's collective bargaining agreement if necessary to end discrimination. *General Building Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 400, 102 S.Ct. 3141, 3155, 73 L.Ed.2d 835 (1982) (this case). During a January, 1986, conference, for example, the court and counsel for the Union had the following exchange:

> The Court: I agree with you, and I am glad to hear that the union is unhappy with the recall, because I am and the plaintiffs are and it will be easy to get rid of it.
>
> Mr. Collins: We are unhappy with being held accountable for it.

---

1. Thus both the referral levels and the hours-worked goals are "directly related to the percentage of nonwhites in the relevant workforce," an aspect of appropriate remedies emphasized by Justice Powell. 106 S.Ct. at 3056.

The Court: Well, you are. You are in charge of the employment, and it has a lot of features to it.

. . . . .

We will just have to take it a step at a time and remove every obstacle in the way of the Court's goal, and the Court will achieve it.

Supp.App. at 37. The Union has repeatedly asserted that the recall privilege must be preserved so that it can maintain its relations with employers. Local 542 argues that contractors will not enter into collective bargaining agreements that lack a recall provision. Judge Bechtle has weighed this consideration in determining the features of the extended decree. The recall right has been preserved for 30 days after an employer lays off a Union member, but if necessary to achieve adequate minority referrals the new Hiring Hall Monitor has been given the power to deny any recall request. These measures are indicative of the district court's flexibility and caution in prescribing the means by which the Union will remedy its prior conduct and of the court's concern that the Union not be made to endure unduly harsh measures because of any discriminatory actions by others.

█ Third, the court extended the decree as a temporary measure necessary to counteract continuing discrimination. If the Union acts to comply with the decree, it will finally achieve appropriate minority work levels by the summer of 1987. Since the decree expires on August 31, 1987, the court order in question will not serve to maintain a non-discriminatory situation. Once the imbalance in work levels created by intentional discrimination is corrected, judicial enforcement will end.

Fourth, the referral requirements do not interfere with the legitimate expectations of white workers. To begin with, the Union's 70% dispatch figure is misleading. It relies on statistics gathered before Judge Bechtle reduced the recall period. He reduced the recall period with the reasonable expectation that the change would decrease the number of jobs taken by recall (and thereby allow the Union to dispatch minority workers at a lower percentage rate and still meet the decree's goals). App. at 675. The Hiring Hall Monitor's new power should have the same effect of reducing the impact of white worker recalls. The decree specifies referrals, not dispatches, and the referral levels range from .9% to 40%. These are the percentages with which this Court must concern itself.

Courts have often set high referral or promotion levels in order to reach minority work levels commensurate with the proportion of minorities in the population. The decree upheld in *United States v. Int'l Union of Elevator Constructors, Local Union No. 5*, 538 F.2d 1012 (3d Cir.1976), for example, provided for a union membership goal of 23% as well as a referral level of 33.33%. As in the present case, modifications were made in the decree in *Bolden v. Pennsylvania State Police*, 73 F.R.D. 370 (E.D.Pa.1976), because the effects of prior discrimination were not being eradicated under the initial decree. The modified decree there set a goal of 9.2% minority corporals, sergeants, and lieutenants, with a promotion level set at 33.33% for minorities and a 50% rate of admitting minorities to each police academy class. As in prior cases, the decree here aims for minority work proportionate to minorities in the population; a 40% referral level in District 1 has become necessary to reach this goal.[2]

Most importantly, white workers dispatched more slowly than minority workers have no vested interest in the work hours that they are being denied. These workers could expect excess work in the past *because of* the Union's discriminatory behav-

2. The original referral goals, approved by this court in 1981, ranged from .7% to 18%. When the Union challenged the injunctive decree under *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), the decree as upheld by this court included the very same referral levels now directly challenged. *Commonwealth of Pennsylvania v. Local Union 542, Int'l Union of Operating Engineers*, 770 F.2d 1068 (3d Cir.1985) (table), *cert. denied,* —— U.S. ——, 106 S.Ct. 803, 88 L.Ed.2d 779 (1986).

ior. The decree here does not interfere with a valid seniority system, as the remedy did do in a case heavily relied upon by the Union, *Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), but instead aims to correct the specific practices upon which the Union's Title VII liability is based. This court rejected the legitimacy of the Union's past referral hierarchy in an earlier round of this litigation:

> Here ... the referral system, which operates on seniority principles, was found by the district court to be not bona fide. Indeed, it was found to be the very mechanism of the intentional race discrimination. A seniority system which is created or maintained with discriminatory intent is by definition not bona fide.

App. at 658. Basic principles of equity do not allow lucky individuals to continue to benefit directly from unlawful behavior once the illegality has been proven in court. A temporary injunctive decree aimed at ridding the referral system of discrimination corrects injustices rather than imposing new ones, as the Union tries to suggest.

We agree wholeheartedly with the dissent that the impact on white workers must be considered here, but the dissent misconstrues "the burden imposed on innocent nonminorities." At 342. The most important concern for both white and minority Union members who rely on the hiring hall for their livelihood is the number of hours worked, not the number of dispatches or recalls received. By focusing on the delay in dispatching white workers that results from the decree, the dissent appears to lose sight of the fact that once on the job, white workers have been kept on the job for significantly longer periods of time, thereby earning considerably more take-home pay. The district court raised the referral goals because of this development. App. at 673 n. 6. Thus although minority workers may remain out of work for shorter periods, they are often out of work and they continue to receive less than their share of the important commodity—their hourly wage.

Furthermore, contrary to the suggestions of the dissent, the burden imposed by the decree on nonminority Union members is spread among all of these workers. The injunction speaks only of referrals, by any method, and of hours worked. The extended decree in no way determines that certain white workers will be recalled consistently, while others must "bat out of the hall." If this is indeed the case—and the record does not substantiate it—there is no reason to believe it results from anything other than bona fide competition in the market for operating engineers.

Finally, the referral requirements were narrowly tailored by the district court to counteract discrimination in the allocation of work obtained through Local 542's exclusive hiring hall. An unchallenged finding of fact declares that minority workers have been denied their fair share of the hours worked by Union members. In ordering the Union to refer minority workers at a rate that will give those discriminated against in the past an appropriate share of the work, the court is remedying this discrimination in the only way possible given the nature of the industry. When it first imposed the affirmative, race-conscious requirements of the initial injunction, the district court stated, "There is simply no other way, given the circumstances of this case, to effectively remedy the discrimination found here." 488 F.Supp. at 993. This conclusion was affirmed by this Court when the case was first here. The district court has expanded the decree only after it became clear that greater enforcement efforts were necessary to guarantee relief from the Union's illegal conduct.

We share a number of the concerns expressed in the dissent of Judge Cowen. We find ourselves in disagreement with the dissent, however, because we believe the efforts of the district judge equitably to reconcile the conflicting interests before him must be judged on the basis of the record and posture of this case when he was called upon to make the decision we here review. The issue, as we see it, is not

whether it would be preferable to have a sufficient record to determine whether employer discrimination is currently taking place and, if so, whether it would be preferable for someone to join one or more employers. Rather, the issue is whether, given the record in this case, the district judge abused his discretion when he extended the decree for two years in an effort to secure for the plaintiffs the fair share of working hours which they previously had been found to deserve.

In 1961, the Union insisted upon and won a hiring hall system which forced the channeling of all employment opportunities with contractors in the industry through the hands of the Union. The record in this case shows that the Union has deliberately manipulated that system to the plaintiffs' detriment for over two decades during which period the white members of the Union have received far more than their fair share of working hours and wages. In 1979, the district court held that plaintiffs were entitled to a remedy that would result in their obtaining working hours proportionate to the minority representation in the workforce; that decision was affirmed by the Supreme Court.

It was in this context that the hearings were held which culminated in the extension of the decree. In those hearings the Union conceded that after five years of waiting the plaintiffs had not secured the relief to which they were entitled. Moreover, the plaintiffs' evidence demonstrated, as the court found, that the Union could have complied with the referral requirements and this would likely have provided plaintiffs with their fair share of working hours. When called upon to explain why it had not done so, the Union only pointed to the fact that, under the 90–day recall provision, the employers controlled 56% of the hours worked through recall and only 13%, rather than 18%, of the recalls went to minority workers. The Union did not tender evidence tending to show what phe-

nomenon or phenomena are producing this statistical disparity. Judge Cowen posits four plausible candidates, three of which can be attributed to the Union and one of which cannot. The difficulty with the dissent's point is that on this record, one can only speculate as to there being any discrimination by anyone other than the Union. As the Master stressed in his report, when asked to explain why it had not given plaintiffs their due, the Union produced "no evidence" that recalls by any employer or employers had been the result of discrimination on the employer's part.

Despite the failure of the Union to produce any evidence of employer discrimination, the district court was sensitive to the problem that the 90–day recall provision created for the Union. It agreed to take steps to reduce the number of hours controlled by the employer and gave the Hiring Hall Monitor authority to deny any recall request. If the Union obtains information indicating that one or more employers are engaging in discrimination, it is free to seek further interim aid from the district court. Moreover, if it obtains such information, it will owe an affirmative duty to its minority members to take action against the offending employer or employers to enforce the non-discrimination provisions of its collective bargaining agreements. *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985). Contrary to the suggestion of the Union, there is nothing in the record to indicate that the extension of the decree worked a change by which the discriminating Union became the helpless victim of employer discrimination.

The extended decree issued by the district court mandates the type of affirmative, race-conscious relief contemplated by the Supreme Court in *Local 28, Sheet Metal Workers.*[3] The referral requirements in this case violate neither Title VII nor the Constitution. They are part of a flexible, well-designed district court plan to end pro-

---

**3.** Justice Brennan's opinion cites the recent Third Circuit Court of Appeals decision in this case upholding this injunction, including the current referral requirements, for the proposi-

tion that racial preferences are appropriate under certain circumstances. 106 S.Ct. at 3037 (Brennan, J., joined by Marshall, J., Blackmun, J., and Stevens, J.).

tracted discrimination. Local 542's allegations of inequity lack merit. Therefore, we conclude that the district court did not abuse its discretion in issuing the orders in question. Consequently, the extended decree will be affirmed.

COWEN, District Judge, dissenting:

*Providing an effective remedy for racial discrimination remains one of the most important tasks of the federal courts. Nevertheless, when a federal court promulgates a decree that distinguishes between individuals on the basis of race, the decree must be narrowly tailored to the violations it seeks to correct and must respect the legitimate interests of all affected by it. Since the decree in this case is not narrowly tailored and fails to adequately respect the legitimate interests of nonminority members of Local 542, I respectfully dissent.*

I

In *Local 28, Sheet Metal Workers v. EEOC,* — U.S. ——, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) the Supreme Court held that affirmative, race-conscious remedies are sometimes appropriate even if individuals who are not identifiable victims of past discrimination benefit thereby.

A plurality of four Justices (Brennan, J., joined by Marshall, J., Blackmun, J., and Stevens, J.) specifically noted that they "do not mean to suggest that such relief is always proper." 106 S.Ct. at 3050. Instead, although acknowledging that the fashioning of appropriate remedies invokes the equitable discretion of the district court, the plurality

emphasize[d] that a court's judgment should be guided by sound legal principles. In particular, the court should exercise its discretion with an eye towards

Congress' concern that race-conscious affirmative measures not be invoked simply to create a racially balanced work force.

*Id.* The plurality also noted that

a court should consider whether affirmative action is necessary to remedy past discrimination in a particular case before imposing such measures, and that the court should also take care to tailor its orders to fit the nature of the violation it seeks to correct.

*Id.*

Justice Powell, whose fifth vote was essential to the judgment of the court, agreed that a race-conscious remedy must be narrowly tailored. 106 S.Ct. at 3050 (Powell, J., concurring in part and concurring in the judgment).[1] Unlike the plurality, which rested on general equitable principles for this conclusion, Justice Powell relied on equal protection doctrine. *Id.* Thus all five Justices who upheld the particular remedy at issue in *Local 28* stated that a federal court may not impose a race-conscious remedy unless that remedy is tailored to fit the nature of the violation it seeks to correct.

To understand the problems with the remedy crafted by the district court in this case, three terms regarding the operation of the hiring hall must be explained:

*Dispatch* refers to the practice of an employer calling the hiring hall with a job to fill. The union is to send out the next qualified member on the applicable out-of-work list.

*Recall* refers to the practice of an employer calling back a particular union member who has recently worked for him.

---

1. Justice Powell also stated that the percentages set should be "directly related to the percentage of nonwhites in the relevant workforce." 106 S.Ct. at 3056. In this case, the 40% referral rate in District 1 is double the approximately 20% of the relevant population who are members of the minority groups. The majority concludes that the "direct relationship" requirement is met because the 40% referral rate was set in order to achieve hours commensurate with the percentage of minorities in the relevant population. I question whether this is the sort of "direct relationship" which Justice Powell had in mind. Because I would rest on other grounds, I need not reach this issue. Further elucidation may be forthcoming from the Supreme Court in the near future. *See U.S. v. Paradise,* No. 85–999 (argued November 12, 1986).

*Referral,* as used in the court decrees, was interpreted in September of 1984 to include both dispatches and recalls. *See* App. at 645.

The original decree in this case was scheduled to expire by its own terms on August 31, 1985. Plaintiffs sought an extension of the decree because, although the decree (after modifications in 1983 and 1984) required that they work 18% of the hours and receive 40% of the referrals, they were not receiving the required hours and referrals. (For convenience, all percentage references are to District 1, the district with the highest percentage of minorities.) It is undisputed that the union was giving 40% of its dispatches to minorities. However, only 13% of recalls by employers went to minorities. Minorities, therefore, did not receive the 40% referral rate required by the court. The district court specifically stated that "without the employer recall feature, the Union would have met the court mandated 40% minority referrals." App. at 674.

Assuming, as is likely, that racial discrimination is involved, there are four possible explanations for the shortfall in minority referrals despite the 40% minority dispatch rate:

1) the union continued to discriminate by manipulating the dispatches in order to give more desirable jobs (i.e. jobs with a greater likelihood of producing a recall) to nonminorities;

2) the union continued to discriminate by providing inadequate training to minorities and thereby rendering them less attractive to employers;

3) the effects of prior union discrimination were not dissipated because employers need time before they are sufficiently familiar with an employee's work that they are likely to recall him;

4) employers discriminated against minorities.

If union manipulation was the cause of the shortfall, then it is certainly appropriate to impose a remedy on the union. Indeed, Judge Higginbotham premised his finding of discrimination in part upon the failure of the union to adhere to its own rules governing referrals from the out-of-work lists. ("The union procedure in general constituted a motley fabric of arbitrary departures from the rules." 469 F.Supp. at 381). However, although the district court in extending the decree found that the union "has continued to use the hiring hall as a tool of discrimination," App. at 676, the court did not explain this statement or point to any evidence of manipulation. Rather, it appears that the district court based this conclusion on the fact of the referral shortfall itself.[2] The majority makes precisely the same error in concluding that "[t]he referral requirements have been extended ... in an effort to end at last the Union's proven discriminatory ways." Majority at 335.

Similarly, if the cause of the shortfall is the inadequate training of minorities by the union, further remedial action by the union is necessary. However, if inadequate training is the cause, the remedy should be focused on training and not on dispatches.

If the referral shortfall is one of "the lingering effects of pervasive discrimination," further remedial requirements placed on the union may be appropriate. *See Local 28,* 106 S.Ct. at 3050 (plurality opinion).

On the other hand, if employer discrimination is the cause of the shortfall, then there is simply no justification on this record to hold the union responsible. It is clear that employers control the number of hours worked per referral and that they have kept white workers on the job longer. *See* Majority at 331. It is also clear that employers more frequently recall white workers. *See* Majority at 333. Certainly these facts suggest the possibility of employer discrimination.

The district court did not explore which of the foregoing possible causes actually

---

**2.** Moreover, the union does not challenge on appeal the decision by the district court to appoint a monitor to run the hiring hall. A court-appointed monitor in the hiring hall can certainly prevent any manipulation by the union.

caused the shortfall. In the absence of such an inquiry, the possibility is all too real that the union is being held responsible for remedying the employers' discrimination. The majority concludes that since the union did not prove employer discrimination, this possibility is of no concern. Yet the majority concedes that "one can only speculate" as to the cause of the shortfall. Majority at 338. Such a remedy cannot be considered narrowly tailored to fit the violation it seeks to correct.

## II

Both the plurality and the concurrence in *Local 28* stated plainly that a race-conscious remedy cannot be imposed which unnecessarily trammels the interests of nonminorities. 106 S.Ct. at 3052 (plurality); 106 S.Ct. at 3055 (Powell, J., concurring in part and concurring in the judgment); *see also Wygant v. Jackson Board of Education,* — U.S. —, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). The majority declares that the interests of white workers are not legitimate and asserts that "[t]hese workers could expect excess work in the past *because of* the Union's discriminatory behavior." Majority at 336 (emphasis in original).[3] There are two serious flaws in this reasoning.

First, the majority assumes, without any factual foundation, that the nonminority employees who rely on dispatches for work are the same individuals who received more than their fair share of dispatches in the past. Certainly the interests of an individual who did not receive such benefits from discrimination cannot be brushed aside as illegitimate.

Second, and perhaps more fundamental, the majority's analysis is apparently based upon a misunderstanding of the nature of the interest involved. Under the hiring hall procedures embodied in the collective bargaining agreement, a worker is to be dispatched based on the length of time he has been out of work: the longer he is out of work the sooner he can expect to be dispatched. This interest is entirely independent of any prior discrimination.[4]

It is true that in the past the union disregarded the rules of the dispatch system in a racially discriminatory manner. Absent a finding that such behavior continues, however, the interests created by the equitable system of "first laid off, first re-hired" must be considered legitimate.[5]

Nor can the majority rely on this court's prior opinion regarding the applicability of *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). *See* Majority at 335. In distinguishing *Stotts* from this case, the prior decision correctly noted that this case does not involve a bona fide seniority system. App. at 658–59. However, simply because the nonminority workers have no legitimate interests based on seniority does not mean that they have no legitimate interests at all; nor does it mean that they have no legitimate interests based on the length of time they have been out of work.

Once the interests of nonminority workers are recognized, at least in part, to be legitimate, it is necessary to determine whether those interests have been sufficiently respected by the decree. Two interrelated factors must be considered: the

---

**3.** The majority also states that "the impact on white workers must be considered." Majority at 337. I do not understand why the "impact" on those whose interests are deemed illegitimate must be considered.

**4.** There may be some interests which nonminorities have in the dispatch system which can be considered illegitimate because they are based on prior discrimination. Separate out-of-work lists are maintained for different levels of experience. In addition, a worker without the specific skills an employer demands for a specific job can be bypassed on the applicable out-of-

work list. To the extent that a nonminority worker has greater skills and experience because of prior discrimination, his interests can be discounted. This conclusion, however, does not undermine the legitimacy of his interests based solely on his length of time out of work.

**5.** The majority's reasoning can also be read to suggest that once a procedure is tainted by discrimination, even a non-discriminatory use of that procedure is illegitimate. Such a conclusion is simply unsupportable.

seriousness of the burden imposed and the diffuseness of that burden.

In *Wygant v. Jackson Board of Education*, —— U.S. ——, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), the Supreme Court held that a race-conscious system of determining layoffs violated the Equal Protection Clause. Although no opinion commanded a majority of the Court,[6] the plurality emphasized that being laid off from a job is far more burdensome than not being hired in the first place. A layoff can severely disrupt an individual's life while a hiring goal, like a school admissions goal, often forecloses only one of several possibilities. 106 S.Ct. at 1851–52. Similarly, the plurality emphasized that a layoff imposes the entire burden on the particular individuals laid off while a hiring goal diffuses that burden among all potential applicants. Because of the severe burden imposed on particular individuals, the plurality concluded that the layoffs violated the Equal Protection Clause. *Id.*

The decision in *Wygant* largely foreshadowed the decision on *Local 28. Local 28* involved a membership goal rather than layoffs. The plurality noted that the membership goal "did not require any member of the union to be laid off, and did not discriminate against *existing* union members." 106 S.Ct. at 3053 (emphasis in original). Justice Powell analogized a membership goal to a hiring goal and specifically relied on the plurality opinion in *Wygant* for the proposition that a hiring goal typically imposes a less severe and more diffuse burden than a layoff. 106 S.Ct. at 3057.

Justice Powell also stated:

Of course, it is too simplistic to conclude from the combined holdings of *Wygant* and this case that hiring goals withstand constitutional muster whereas layoff goals ... do not. There may be cases, for example, where a hiring goal in a particularly specialized area of employment would have the same perni-

cious effect as the layoff goal in *Wygant*. The proper constitutional inquiry focuses on the effect, if any, and the diffuseness of the burden imposed on innocent nonminorities, not on the label applied to the particular employment plan at issue.

106 S.Ct. at 3057, n. 3.

In this case, the burden imposed on innocent nonminorities individuals is heavy: each nonminority worker is dispatched to work far less often than each minority worker. For a worker who must "bat out of the hall," relying on such dispatches to earn a living, the impact is clearly severe. The burden if far more analogous to a layoff than to a hiring since the impact is not simply on one option among many, but rather on all options for union work in his chosen trade in the geographical area. Indeed, the employment practice at issue is simply one aspect of a layoff: the decision as to who gets summoned back to work after a layoff. Certainly the defendant board of education in *Wygant*, after laying-off teachers without regard to race in compliance with the Supreme Court's decision, could not call those teachers back to work on a racial basis.

In addition, the burden is not diffused at all. It is not diffused among all potential applicants for jobs as operating engineers. It is not even diffused among all current operating engineers, since those operating engineers who have either long-term jobs with particular employing contractors or good relationships with contractors and therefore get recalls do not share in the burden. Instead the burden is placed squarely on the shoulders of those least able to bear it: those workers who do not have a good relationship with contractors and therefore must "bat out of the hall." The majority callously refers to these people as "lucky individuals [who] continue to benefit directly from unlawful behavior." Majority at 337. I suggest that these workers, far from being "lucky," are

---

6. Justice Marshall, joined by Justices Brennan and Blackmun, commented: "I do not envy the District Court its task of sorting out what this

Court has and has not held today." 106 S.Ct. at 1867.

among the least fortunate of all operating engineers and yet are made to bear the entire burden of achieving the court's goal.

A member of the Local 542 legitimately expects that he will return to work after a layoff as soon as a job that he can do is available, provided he has been out of work longer than anyone else on his out-of-work list. This legitimate interest is unnecessarily trammelled by the court's decree since particular individuals are forced to bear a severe burden.

## III

There is a more general problem with the approach taken by the district court since the case was remanded by the Supreme Court. The issues presented on this appeal all stem from this more general problem.

I agree with the majority that when Judge Higginbotham fashioned the original decree, the "ultimate objective was to achieve, at the end of [the decree's] life, a level of hours worked by minority Union members commensurate with the percentage of minority persons in the local workforce population." Majority at 331. Judge Higginbotham was acutely aware that what really mattered in the end was wages and hours. He wrote:

In the final analysis, the brilliant briefs of counsel, the flash of eloquent arguments, the citations in the future to their case as significant precedent, and even the drama of a packed courtroom will never be adequate mementos for the victims of discrimination who desire money and jobs *now.*

488 F.Supp. 988, 991 (emphasis in original).

I also agree that the referral levels, among other requirement, were subsidiary obligations designed to aid in achieving the hours goals. *See* Majority at 331. As the majority correctly notes, the decree also

provided that referral levels could be increased if necessary to reach the appropriate levels of hours worked. *See* Majority at 331. Such a structure for the decree made eminent sense at the time since the decree imposed obligations on both the union and the contractors in order to achieve the ultimate goal.

However, the Supreme Court determined that no significant obligations could be imposed on the contractors since it had not been proven that they engaged in intentional discrimination. 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). On remand, the district court simply sought to achieve the same ultimate goal without the presence of the contractors. Taking advantage of the provision in the original decree for adjustment of referral goals, the district court gradually increased the referral goals in an attempt to reach the requisite hours. Along the way, the court defined referrals to include recalls. I believe that this approach was fundamentally misguided, based on a misinterpretation of the original decree, and failed to follow the path charted for the district court by the Supreme Court's decision.

The approach was fundamentally misguided because it insisted on achieving a goal which required the actions of both the union and the contractors even though the contractors were no longer bound.[7] This flaw is highlighted by the difficulties the court has had with the recall provision in the collective bargaining agreement. There is no doubt that the recall provision is a major obstacle to achievement of the hours goals of the decree.[8] Only 13% of the recalls by contractors are for minority workers, even though 40% of the dispatched workers which the contractors receive from the union are members of minority groups.

---

**7.** It is ironic that the majority quotes Judge Higginbotham's statement that "[t]here is simply no other way, given the circumstances of the case, to effectively remedy the discrimination found here." Majority at 337. That statement referred to a decree that included both the union and the contractors. It certainly does not

support the proposition that the decree as originally crafted could properly be imposed on the union alone.

**8.** It is not the only obstacle. Another significant obstacle is the contractors' control over how long a job lasts.

In order to deal with this problem, the district court reduced the recall period from 90 days to 30 days. The majority emphasizes that the district court "has shown its willingness to aid the Union ... even to the point of doing away with the recall provisions altogether." Majority at 335. But what would happen if the district court were to totally eliminate the recall provision? It is undisputed that the contractors only agreed to a hiring hall arrangement if they retained the right to recall. Indeed, a ten week strike was required to compel the contractors to accede to the hiring hall at all. *See* 458 U.S. at 378–89, 102 S.Ct. 3143–44. If recall were eliminated and the hiring hall arrangement discontinued, it seems obvious that the union, without the contractors' presence, could not achieve the hours goals. The district court is therefore caught in a balancing act: it uses the hiring hall to approach the hours goals despite the actions of the contractors, but cannot go too far lest it risk losing the only handle it has on achieving those goals.

The district court has also interpreted the term "referrals" to include recalls. I believe that this is a misinterpretation of the original decree. The use of the term "referrals" in the original decree itself suggests that it does not include recalls. Paragraph 14, which concerns referrals, only mentions out-of-work lists. *See* 502 F.Supp. at 10. Out-of-work lists are relevant only to dispatches.

Moreover, nowhere in Judge Higginbotham's discussion of the evidence of discrimination in referrals is there any suggestion that recalls are included. The entire discussion focuses on out-of-work lists, which, as noted above, are relevant only to dispatches. *See* 469 F.Supp. 355–57. Indeed, the only mention of the term "recall" which I have located in Judge Higginbotham's entire liability opinion (which occupies ninety-one pages in the Federal Supplement) indicates that his understanding of "referral" did not include dispatches. In describing the hiring hall system, he wrote:

Other restrictions pertaining to referral are the three refusal rule and the 90 day no-recall rule. An operating engineer who refuses without excuse an offer of employment three consecutive times is to be placed at the bottom of his out-of-work list. No employer is to *recall outside the referral system* after 90 days of separation.

469 F.Supp. at 340, n. 5. (emphasis added).

Lastly, the district court on remand failed to follow the path charted for it by the Supreme Court's decision. The Court specifically stated:

If the Union and the JATC [Joint Apprenticeship and Training Committee] comply with the decree by training and referring minority workers, we see no reason, absent supporting evidence, that the employers will not hire the minority workers referred pursuant to the collective bargaining agreement, and employ them at wages and hours commensurate with those of nonminority workers. If experience proves otherwise, the District Court will then have more than sufficient grounds for including the employers within the scope of the remedial decree.

458 U.S. at 400, 102 S.Ct. at 3155.

The union has complied with the original decree's referral requirements by its level of performance in dispatching minority workers. No issues concerning training obligations are currently before the court. It is incumbent upon the district court to determine whether it is the lack of adequate training by the union or the JATC, racial discrimination by the contractors, or some other cause, which is producing the shortfall. If the reason for the shortfall is failure of the union or the JATC to comply with the decree's training requirements, then strong measures are appropriate to compel compliance. If, however, the reason for the shortfall is contractor discrimination, then, as the Supreme Court foresaw, it is time to bring the contractors back into the case.

## IV

For the reasons explained above, I would vacate the extended decree's referral re-

quirements and remand for a determination of the cause of the disparity between the dispatch rate on the one hand and the recall rate and hours percentage on the other hand. I would also instruct the district court to respect the legitimate interests of nonminority workers in any new remedial decree.